# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HUNGER FREE AMERICA, INC.,
    *Plaintiff*,

    v.

BROOKE L. ROLLINS, et al.,
    *Defendants*.

Case No. 1:25-cv-1815 (JEB)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

Cormac A. Early (DC Bar No. 1033835)
Allison M. Zieve (DC Bar No. 424786)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiff*

June 20, 2025

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 2

    A.   The statutory mandate to USDA to establish and maintain an information clearinghouse of food assistance resources ......................................................... 2

    B.   Plaintiff's contract with USDA to maintain the clearinghouse .......................... 3

    C.   USDA's decision to terminate funding for the clearinghouse ........................... 6

    D.   Effects on Plaintiff. ...................................................................................... 7

Legal Standards ..................................................................................................... 9

Argument ............................................................................................................... 9

    I.   Plaintiff is likely to succeed on the merits. .................................................... 9

    A.   Plaintiff has standing ..................................................................................... 9

    B.   The Tucker Act does not divest this Court of jurisdiction. ............................. 11

    C.   Plaintiffs are likely to succeed on their APA claims. .................................... 16

        1.   USDA's termination of funding for the clearinghouse services constitutes final agency action. ........................................................................ 16

        2.   USDA's termination of funding for the clearinghouse services is contrary to law. ...................................................................................................... 18

        3.   USDA's termination of funding for the clearinghouse services is arbitrary and capricious. ................................................................................................ 20

    II.   Plaintiff will suffer irreparable harm absent preliminary relief. ..................... 22

    III.   The balance of equities and public interest favor Plaintiffs .......................... 25

Conclusion ........................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advocacy Coalition v. Department of State*,

  No. 25-cv-00400-AHA, 2025 WL 752378 (D.D.C. Mar. 10, 2025). ................................. 13, 23

*Air Transport Ass'n of Am. v. Export-Import Bank of the U.S.*,

  840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................................ 23

*Albrecht v. Committee on Employee Benefits of Federal Reserve Employee Benefits System*,

  357 F.3d 62 (D.C. Cir. 2004) ................................................................................ 12

*American Near East Refugee Aid v. USAID*,

  703 F. Supp. 3d 126 (D.D.C. 2023) ........................................................................ 12

*Ark Initiative v. Tidwell*,

  816 F.3d 119 (D.C. Cir. 2016) ............................................................................... 21

*Armour & Co. v. Freeman*,

  304 F.2d 404 (D.C. Cir. 1962) ............................................................................... 23

*Atlas Air Co. v. Int'l Brotherhood of Teamsters*,

  280 F. Supp. 3d 59 (D.D.C. 2017) .......................................................................... 23

*Beattie v. Barnhart*,

  663 F. Supp. 2d 5 (D.D.C. 2009). ........................................................................... 22

*Bennett v. Spear*,

  520 U.S. 154 (1997) ............................................................................................. 17

*C.G.B. v. Wolf*,

  464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................ 25

*California v. U.S. Department of Education*,

132 F.4th 92 (1st Cir. 2025) ........................................................................ 16

*Cardinal Health, Inc. v. Holder*,

846 F. Supp. 2d 203 (D.D.C. 2012) ............................................................. 23

*CC Distribs., Inc. v. United States*,

883 F.2d 146 (D.C. Cir. 1989) .................................................................... 10

*City & County of San Francisco v. Trump*,

897 F.3d 1225 (9th Cir. 2018) .............................................................. 19, 20

*City of New Haven v. United States*,

634 F. Supp. 1449 (D.D.C. 1986) ............................................................... 20

*City of Waukesha v. EPA*,

320 F.2d 228 (D.C. Cir. 2003) .................................................................... 10

*Climate United Fund v. Citibank, N.A.*,

No. 25-cv-698-TSC, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...................... 12, 14

*Community Legal Services in East Palo Alto v. HHS*,

No. 25-cv-02847-AMO, 2025 WL 1168898 (N.D. Cal. Apr. 21, 2025) ................ 16

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,

38 F.4th 1099 (D.C. Cir. 2022) ............................................................ 12, 13

*Department of Education v. California*,

145 S. Ct. 966 (2025) ......................................................................... 15, 16

*Department of State v. AIDS Vaccine Advocacy Coalition*,

145 S. Ct. 753 (2025) .............................................................................. 15

*DHS v. Regents of the University of California*,

591 U.S. 1 (2020) ................................................................................... 21

*Doctors for Am. v. OPM*,

766 F. Supp. 3d 39 (D.D.C. 2025) .............................................................. 24

*EPIC v. Pres. Advisory Comm'n on Election Integrity*,

   878 F.3d 371 (D.C. Cir. 2017) ................................................................ 11

*Express One Int'l v. USPS*,

   814 F. Supp. 87 (D.D.C. 1992) ............................................................... 24

*FCC v. Fox Television Stations, Inc.*,

   556 U.S. 502 (2009) ................................................................................ 22

*Food & Water Watch v. Vilsack*,

   808 F.3d 905 (D.C. Cir. 2015) ............................................................... 11

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,

   460 F.3d 13 (D.C. Cir. 2006) ................................................................. 17

*Great-West Life & Annuity Ins. Co. v. Knudson*,

   534 U.S. 204 (2002) ................................................................................ 15

*In re Aiken Cnty.*,

   725 F.3d 255 (D.C. Cir. 2013) ............................................................... 19

*Industrial Safety Equipment Ass'n , Inc. v. EPA*,

   837 F.2d 1115 (D.C. Cir. 1988) ............................................................. 17

*Kidwell v. Department of Army, Board for Correction of Military Records*,

   56 F.3d 279 (D.C. Cir. 1995) ........................................................... 12, 14

*League of Women Voters of U.S. v. Newby*,

   838 F.3d 1 (D.C. Cir. 2016) ................................................................... 23

*Lincoln v. Vigil*,

   508 U.S. 182 (1993) ................................................................................ 19

*Lujan v. Defenders of Wildlife*,

   504 U.S. 555 (1992) ................................................................................ 10

*Maine Community Health Options v. United States*,

590 U.S. 296 (2020) ............................................................................................. 13, 18

*Maine v. USDA*,

No. 1:25-cv-00131-JAW, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .................................. 16

*Megapulse, Inc. v. Lewis*,

672 F.2d 959 (D.C. Cir. 1982) .............................................................................. 12

*Michigan v. EPA*,

576 U.S. 743 (2015) ............................................................................................. 21

*Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*,

463 U.S. 29 (1983) ............................................................................................... 21

*N.Y. Stock Exch. LLC v. SEC*,

2 F.4th 989 (D.C. Cir. 2021) ................................................................................ 17

*Nat'l Ass'n of Homebuilders v. EPA*,

667 F.3d 6 (D.C. Cir. 2011) ................................................................................. 11

*Nat'l Envt'l Dev. Assoc.'s Clean Air Project v. EPA*,

752 F.3d 999 (D.C. Cir. 2014) ............................................................................. 17

*Nat'l Mining Ass'n v. Jackson*,

768 F. Supp. 2d 34 (D.D.C. 2011) ....................................................................... 23

*Nat'l Taxpayers Union, Inc. v. U.S.*,

68 F.3d 1428 (D.C. Cir. 1995) ............................................................................. 11

*National Federation of Independent Business v. OSHA*,

595 U.S. 109 (2022) ............................................................................................. 19

*Nken v. Holder*,

556 U.S. 418 (2009) ............................................................................................. 9

*PETA v. USDA*,

797 F.3d 1087 (D.C. Cir. 2015) ........................................................................... 11

*Sackett v. EPA,*

    566 U.S. 120 (2012).............................................................................................. 17

*Sherley v. Sebelius,*

    644 F.3d 388 (D.C. Cir. 2011)............................................................................ 9

*TD Intern., LLC v. Fleischmann,*

    629 F. Supp. 2d 46 (D.D.C. 2009)..................................................................... 22

*Teton Historic Aviation Foundation v. U.S. Dep't of Defense,*

    785 F.3d 719 (D.C. Cir. 2015)............................................................................ 10

*Turlock Irrigation Dist. v. FERC,*

    786 F.3d 18 (D.C. Cir. 2015).............................................................................. 11

*Virginia Petroleum Jobbers Ass'n v. FPC,*

    259 F.2d 921 (D.C. Cir. 1958)............................................................................ 23

*Widakuswara v. Lake,*

    2025 WL 1288817, (D.D.C. May 3, 2025)................................................ 14, 15

*Widakuswara v. Lake,*

    2025 WL 1521355, (D.D.C. May 28, 2025)..................................................... 14

*WildEarth Guardians v. Jewell,*

    738 F.3d 298, (D.C. Cir. 2013)........................................................................... 10

*Winter v. Natural Resources Defense Council, Inc.,*

    555 U.S. 7 (2008)................................................................................................. 9

*Wisconsin Gas Co. v. FERC,*

    758 F.2d 669 (D.C. Cir. 1985)............................................................................ 23

*Woonasquatucket River Watershed Council v. USDA,*

    2025 WL 1116157 (D.R.I. Apr. 15, 2025) ....................................................... 16

**Statutes**

2 U.S.C. § 683 ........................................................................................................ 20

28 U.S.C. § 1491 ................................................................................................... 12

42 U.S.C. § 1751 ..................................................................................................... 2

42 U.S.C. § 1769g ....................................................................................... 2, 3, 18

5 U.S.C. § 551 ....................................................................................................... 17

5 U.S.C. § 704 ....................................................................................................... 17

5 U.S.C. § 706 ................................................................................................. 16, 21

**Treatises**

Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 (3d ed.) ................................. 24

## INTRODUCTION

For more than thirty years, the United States Department of Agriculture (USDA) has been required by statute to contract with a nongovernmental organization to establish and maintain a clearinghouse of governmental and private food-assistance resources to help Americans in need to secure adequate nutrition. Since 2014, Hunger Free America (HFA) has held the clearinghouse contract, operating the National Hunger Hotline to provide live assistance to callers and an automated texting service and online database of food resources to help those in need to locate convenient local sources of assistance at any time. Hunger Free America's clearinghouse services have assisted thousands of users every month, at the cost of only $250,000 per year to USDA.

In May 2025, USDA, with only eight hours of notice to HFA, decided to terminate funding for the clearinghouse services. It allowed HFA's contract to lapse on midnight of May 20, 2025, with no alternative provider lined up to maintain service, and since then has taken no public steps to enter into a new clearinghouse contract with any organization. Instead, USDA has taken down the main webpage for the National Hunger Hotline and removed other references to the hotline from its website. USDA's decision to terminate funding for the clearinghouse services was arbitrary, capricious, and contrary to law.

HFA has been able to keep the clearinghouse services running temporarily by diverting resources from other priorities, but is at imminent risk of having to shut down the hotline.

This Court should enter a preliminary injunction ordering USDA to immediately comply with its statutory duty to enter into a contract with a nongovernmental organization—whether HFA or another qualified contractor—to maintain the clearinghouse services. USDA's statutory duty is clear, the public interest overwhelmingly supports the preservation of the clearinghouse services, and HFA suffers irreparable harm every day that USDA's unlawful decision to terminate funding is allowed to persist.

## STATEMENT OF FACTS

**A.    The statutory mandate to USDA to establish and maintain an information clearinghouse of food assistance resources**

In the Healthy Meals for Healthy Americans Act of 1994, Congress amended the Richard B. Russell National School Lunch Act, 42 U.S.C. § 1751 *et seq.*, to provide that the Secretary of Agriculture "shall enter into a contract with a nongovernmental organization" to "establish and maintain a clearinghouse to provide information to nongovernmental groups located throughout the United States that assist low-income individuals or communities regarding food assistance, self-help activities to aid individuals in becoming self-reliant, and other activities that empower low-income individuals or communities to improve the lives of low-income individuals and reduce reliance on Federal, State, or local governmental agencies for food or other assistance." Pub. L. No. 103-448 § 123, 108 Stat. 4699, 4731 (1994), *codified at* 42 U.S.C. § 1769g.

The statute specifies that the nongovernmental organization "shall be selected on a competitive basis," subject to six enumerated criteria: that the organization (1) "be experienced in the gathering of first-hand information in all the States through onsite visits to grassroots organizations in each State that fight hunger and poverty or that assist individuals in becoming self-reliant;" (2) "be experienced in the establishment of a clearinghouse similar to the clearinghouse" that it would have to establish and maintain under the contract; (3) "agree to contribute in-kind resources toward the establishment and maintenance of the clearinghouse and agree to provide clearinghouse information, free of charge, to the Secretary, States, counties, cities, antihunger groups, and grassroots organizations that assist individuals in becoming self-sufficient and self-reliant;" (4) "be sponsored by an organization, or be an organization, that—(A) has helped combat hunger for at least 10 years; (B) is committed to reinvesting in the United States; and (C) is knowledgeable concerning Federal nutrition programs;" (5) "be experienced in communicating

2

the purpose of the clearinghouse through the media, including the radio and print media, and be able to provide access to the clearinghouse information through computer or telecommunications technology, as well as through the mails;" and (6) "be able to provide examples, advice, and guidance to States, counties, cities, communities, antihunger groups, and local organizations regarding means of assisting individuals and communities to reduce reliance on government programs, reduce hunger, improve nutrition, and otherwise assist low-income individuals and communities become more self-sufficient." 42 U.S.C. § 1769g(b).

Congress has consistently appropriated funds, and presidents have signed into law the appropriations bills containing those funds, to support the clearinghouse services, most recently in the Consolidated Appropriations Act of 2024, which extended the annual appropriation of $250,000 for the clearinghouse services through fiscal year 2025. *See* Pub. L. 118-41, Div. B., Title IV, Mar. 9, 2024, 138 Stat. 92. Congress directed that "[t]he Secretary shall be entitled to receive the funds and shall accept the funds, without further appropriation." 42 U.S.C § 1769g(d).

### B.    Plaintiff's contract with USDA to maintain the clearinghouse

Hunger Free America is a non-partisan, national 501(c)(3) non-profit group working to end domestic hunger and ensure that all Americans have sufficient access to nutritious food. *See* Berg Decl. ¶ 3. HFA conducts research on, and proposes and advocates for, concrete policy solutions to combat hunger, reduce poverty, improve community nutrition, and expand economic opportunity. *Id.* It also acts as a direct service provider. HFA's direct service activities include: serving as an intermediary organization on behalf of the federal government to sponsor a team of AmeriCorps VISTA national service participants who expand the capacity of food pantries, soup kitchens, food banks, and child nutrition programs in placements at community-based nonprofit groups from coast-to-coast; recruiting volunteers to provide skilled assistance in support of both faith-based and community organizations that fight hunger; helping low-income Americans access private

and public sources of food through pre-screening and application submission work; and training recipients of Supplemental Nutrition Assistance Program (SNAP) benefits for jobs in social services in order to reduce their future need for such benefits and to boost their long-term economic self-sufficiency. *Id.*

USDA awarded the clearinghouse contract to Hunger Free America for the first time in October 2014, and HFA has operated the clearinghouse services continuously since then. *See id.* ¶ 6.[1] Plaintiff subsequently bid for, and was awarded, the clearinghouse contract again in 2017, 2019, and 2024. *Id.* ¶ 16. USDA staff informed HFA's Chief Executive Officer that HFA was the only bidder for the 2024 contract. *Id.* ¶ 20. The 2024 clearinghouse contract provided for an initial "Base Period" of one year, from May 21, 2024, to May 20, 2025, with four twelve-month "option years" that could be exercised at USDA's unilateral discretion. *Id.* ¶ 22. It also separately provided for an "option to extend services," whereby USDA "may require continued performance within the limits and at the rates specified in the contract" for a period "not to exceed 6 months," without extending the contract by exercising an option year. *Id.* ¶ 23.

Plaintiff provided—and, at least for now, still provides, *see infra* pp. 7-8—four clearinghouse services under its contract with USDA. First, HFA maintains a free publicly accessible online database of public and private food assistance resources, searchable by address. Berg Decl. ¶ 7. As of June 16, 2025, the database contains 47,426 listings of resources such as community food pantries and soup kitchens, WIC clinics, and summer meals sites for children. *Id.* Second, HFA operates the National Hunger Hotline, a toll-free number that assists callers with

---

[1] USDA delegated its authority to Defendant Food and Nutrition Service (FNS), a component of USDA that oversees domestic food and nutrition programs on behalf of USDA, to oversee the clearinghouse contract on behalf of USDA. For convenience, this brief uses "USDA" to refer to both USDA and FNS.

locating emergency food resources in their communities. *Id.* ¶ 8. Third, HFA operates an automated texting service, available around the clock, that assists users with locating food assistance resources. *Id.* ¶ 9. The hotline and the texting service rely on the database to direct users to the most conveniently located resources. Fourth, HFA publishes a monthly electronic newsletter for food service providers and social service agencies nationwide, containing information on best practices in fighting hunger and resources available to do so. *Id.* ¶ 10. The 2024 contract provided that the hotline, the texting service, and the database are all property of the federal government and that the contractor "shall furnish core documentation" for those services "upon the request of USDA." *Id.* ¶ 26.

The National Hunger Hotline operates weekdays from 8:00 a.m. to 8:00 p.m., with live service in English and Spanish, and support for other languages via a live phone translation service. Berg Decl. ¶¶ 8, 13. HFA employs a minimum of four staffers (three full-time and one part-time) to maintain the hotline, with additional staff and volunteers as needed during times of increased call volumes. *Id.* ¶ 12. Hotline staff are specifically trained to be familiar with eligibility requirements (for general information purposes) for all programs, public and private, to which the hotline refers callers, and to assist callers using general descriptions because callers are often not familiar with official program names (such as "CalFresh" for SNAP in California). *Id.* Hotline staff are also trained in personal crisis management because many callers contact the hotline during times of severe emotional distress. *Id.* HFA has successfully managed widely varying call volumes to the hotline; for example, from 2019 to 2020, with the onset of the COVID-19 pandemic, call volumes more than quadrupled, from 8,305 to 33,380; call volumes remain elevated from pre-pandemic levels, with 25,121 calls in 2024. *Id.* ¶ 14. Overall, since 2014, HFA has assisted more than  225,000 hotline callers. *Id.*

The texting service allows users to locate food resources based on automated responses to designated keywords. *Id.* ¶ 9. For example, texting "SNAP" triggers an automated response prompting the user to reply with the two-letter abbreviation for their state (such as "NY" for New York), which in turn triggers a text with the state's SNAP hotline number, Electronic Benefits Transfer (EBT) hotline, and a link to the state's official SNAP webpage. *Id.* Users who do not text keywords or phrases that trigger an automated response receive live text responses from HFA staff who monitor the text message inbox during hotline operating hours. *Id.*

HFA spends considerable staff time and monetary resources to expand and validate the food resources database to ensure that it is as comprehensive and as up to date as possible, which is challenging given that many community-based organizations change their operating information frequently. *Id.* ¶ 15. Hotline staff conduct frequent audits to validate entries in the database during their scheduled shifts when not handling incoming calls, and HFA staff and highly-trained volunteers also conduct data audits as needed. *Id.* For the contract year ending in May 2025, HFA validated or updated 5,024 database entries. *Id.*

The total operating cost for the clearinghouse services for that year was $671,603, with HFA raising funds from private sources to cover costs beyond the $250,000 contractual award. *Id.* ¶ 16. HFA would be unable to maintain the clearinghouse services in the long term using private funds alone. *Id.* ¶¶ 16, 31 – 33.

USDA regularly evaluated HFA's performance under the contract and never issued a rating below "satisfactory" on any category. *Id.* ¶ 19.

### C.    USDA's decision to terminate funding for the clearinghouse

On May 7, 2025, with the base year of the contract drawing to a close, and with no formal indication from USDA about its intentions for maintaining the clearinghouse services going forward, HFA emailed USDA to inquire about the future of the services, with a reminder that

federal law requires USDA to "maintain" the clearinghouse. Berg Decl. ¶ 24. A USDA contracting officer responded that "it is the Government who determines agency need to go along with that particular law." *Id.*

At 4:00 p.m. on May 20, 2025, eight hours before the contract lapsed at the end of the one-year base period, a USDA contracting officer emailed HFA stating that "[a]t the present time, the contract will expire today. Unfortunately, once the contract expires, terms and conditions will cease and not continue, therefore, the award will end." *Id.* ¶ 25.

USDA subsequently removed references to the hotline from at least three locations on its website. *Id.* ¶ 28. It removed a dedicated webpage about the hotline, and removed mentions of the hotline from the FNS "Contact Us" webpage and from the "Sun Meals" site-finder webpage (a webpage used to inform the public about how to access federally funded summer meals for children in limited-income households.). *Id.*

**D.    Effects on Plaintiff.**

By relying entirely on privately raised funds, including funds diverted from other organizational priorities, HFA has been able to temporarily maintain the clearinghouse services since May 21, 2025. *Id.* ¶ 30. But HFA cannot maintain the clearinghouse services indefinitely without financial support from USDA. *Id.* ¶ 32. Already, HFA has had to transfer funds from its Data Department to keep the services operational, at the direct expense of its research work, which policy makers at the federal, state, and local levels rely on for accurate information about domestic hunger, as well as to the detriment of HFA's food benefits access work. *Id.* ¶ 30. HFA will either have to shut down the clearinghouse services in the coming weeks or have to continue diverting resources from other programs. *Id.* ¶ 32.

Given competition for nonprofit funding, it is extraordinarily unlikely that HFA could raise sufficient private funding to maintain clearinghouse services in the long term. *Id.* ¶ 33. An HFA

clearinghouse without federal government support would thus likely have to cut back on services, with some combination of shorter hours of operation, longer wait times for callers, and less comprehensive and reliable coverage of food-assistance resources. *Id.* Moreover, because the established hotline number belongs to USDA, any long-term effort by HFA to replicate the clearinghouse services without USDA's support would require HFA to establish a new hotline number, and it would likely take years of effort, and very substantial investment—above and beyond the ordinary costs of running the clearinghouse services—to achieve the level of public awareness that the current hotline number enjoys. *Id.*

If USDA were to promptly award a new clearinghouse contract, as the School Lunch Act requires, whether to HFA or to another qualified contractor, HFA would not be required to attempt to re-create its own version of the clearinghouse at the expense of other organizational priorities. *Id.* ¶ 34.

Uncertainty over USDA's commitment to the clearinghouse services directly impairs HFA's fundraising efforts and thus its ability to maintain the services. *Id.* ¶¶ 30, 35. If private funders had assurance that USDA would promptly award a new clearinghouse contract—whether to HFA or to another qualified contractor—securing the funds necessary to keep the clearinghouse services running until the new contract is awarded would become substantially easier. *Id.* ¶ 35.

Because of the uncertainty created by USDA's decision to allow the clearinghouse contract to lapse without replacement, some hotline staff have already started seeking new employment. *Id.* ¶ 36. If HFA were to lose its highly trained and experienced hotline staff, it would have great trouble finding and hiring people with a similar level of skill and expertise in handling the kinds of calls the hotline receives. *Id.*

Because many callers learn of the hotline through word of mouth, any interruption to the normal operations of the hotline would risk irreparably damaging the hotline's reputation and its utility as a means of helping callers secure food assistance. *Id.* ¶ 37. Disruption would be particularly harmful now, because the hotline normally receives its greatest volume of calls in early to mid-summer, when school meal programs are mostly closed and low-income families seek alternative sources of food. *Id.*

HFA could maintain the clearinghouse services on the terms and at the rates laid out in the 2024 contract for as long as necessary for USDA to carry out competitive bidding procedures for a new clearinghouse contract. *Id.* ¶ 38. HFA will bid for a new clearinghouse contract as soon as USDA indicates that bidding is open. *Id.* ¶ 39.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the government is the opposing party, the last two factors of the analysis merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.    **Plaintiff is likely to succeed on the merits.**

A.    **Plaintiff has standing.**

Standing requires a plaintiff to establish an injury in fact that is concrete and particularized, as well as actual or imminent rather than conjectural or hypothetical, a causal connection between the injury and the challenged conduct, and the likelihood that a favorable decision would redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). For purposes of standing,

9

the Court must "assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam).

HFA has standing to challenge USDA's unlawful termination of funding for the clearinghouse services in two ways. First, it has lost the opportunity to bid in the statutorily mandated competitive bidding process for the clearinghouse contract. As the D.C. Circuit has recognized, "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit*," even if "the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *Teton Historic Aviation Foundation v. U.S. Dep't of Defense*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). Courts "relax the redressability and imminence requirements for a plaintiff claiming a procedural injury," such as HFA's loss of the opportunity to bid for the clearinghouse contract. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). HFA thus has standing based on the deprivation of its right to bid for the clearinghouse contract.

Second, HFA has standing due to the harm that USDA's illegal actions have caused to its organizational interests, and the ensuing need to divert resources away from other priorities to address that harm. *See EPIC v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). The government's illegal actions injure an organization's interest when they "perceptibly impair[] the organization's ability to provide services," *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)), which occurs when the defendants' conduct causes an "inhibition of [the organization's] daily operations," *id.* (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). And an organization's use of resources to counteract that harm is sufficient when the organization thereby incurs "operational costs beyond those normally expended." *Nat'l Ass'n of*

*Homebuilders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).

Here, as described above, USDA's unlawful actions imminently threaten HFA's ability to provide the clearinghouse services, and HFA has already incurred extraordinary operational costs to keep the clearinghouse services running. *See* Berg Decl. ¶¶ 30-33. If USDA does not reverse course, HFA will either have to shut down the clearinghouse services—a clear "inhibition" of its daily activities—or divert resources to keep them running at the expense of other priorities. For this reason as well, HFA has standing here.

### B.    The Tucker Act does not divest this Court of jurisdiction.

This APA case challenges USDA's failure to comply with its statutory obligation to contract with a nongovernmental organization to establish and maintain the clearinghouse services. HFA does not allege any breach of contract by the government, and it does not seek to require USDA to contract with HFA specifically. There is thus no barrier to this Court's jurisdiction to hear HFA's claims.

**1.** In recent litigation, the government has argued that the Tucker Act, which directs certain contract claims against the government to the Court of Federal Claims, provides the sole avenue for relief when an agency terminates a contract. That argument is unavailing here. The Tucker Act waives the United States' sovereign immunity for actions "founded … upon any express or implied contract with the United States" and authorizes the Court of Federal Claims to hear such cases. 28 U.S.C. § 1491(a)(1). But the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and thus directly within the Tucker Act.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982)). The Tucker Act applies, and the Court of Federal Claims has exclusive jurisdiction, only "when

three conditions are met: (1) The claim 'is essentially a contract action,' (2) the claim 'explicitly or in essence seeks more than $10,000 in monetary relief from the federal government,' and (3) the Court of Federal Claims can exercise jurisdiction over the claim." *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (internal citations omitted) (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), and *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Here, none of those requirements are met.

As to the first requirement, this case is not "essentially a contract action." To determine whether an action "essentially" sounds in contract, courts consider both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 . Here, the rights that Plaintiffs assert stem from federal statutes—namely the School Lunch Act, the Impoundment Control Act, and the arbitrary and capricious standard of the APA—not from any implied or express contract with the government. *See Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 1131412, at *9 (D.D.C. Apr. 16, 2025) (explaining, in exercising jurisdiction over challenge to Environmental Protection Agency's pause in funding for a program, that "[w]hile it is true that the parties have entered into grant agreements that operate as contracts, the claims here turn on, at least in part, examining the federal regulations and federal statute governing Plaintiffs' grant awards"). "[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-cv-00400-AHA, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025).

Like the source of the rights that Plaintiff asserts, the remedies it seeks also are not contractual. HFA asks this Court to declare that USDA's termination of funding for the clearinghouse services was arbitrary, capricious, and contrary to law, and to order USDA to enter into a contract with a nongovernmental organization to establish and maintain the clearinghouse services. That relief is quintessentially declaratory and equitable and does not resemble the "explicitly contractual remedy of specific performance" or the "prototypical contract remedy of money damages." *Crowley*, 38 F.4th at 1107 (internal quotation marks omitted); *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 326–27 (2020) (distinguishing claim for money damages or "past due sums" from claims seeking prospective declaratory and injunctive relief).

As to the second requirement, HFA does not, either explicitly or in essence, seek any monetary relief from the federal government. The order it seeks may result in a future contract between USDA and HFA, but it also may not. HFA is not asserting any entitlement to the clearinghouse contract, but rather to a fair opportunity to bid for it and to have USDA comply with the statutory mandate to award the contract to a nongovernmental organization.

As to the third requirement, the Tucker Act does not apply because the Court of Federal Claims could not exercise jurisdiction over HFA's claims. The Supreme Court has "categorically" held that "the Court of Claims has no power to grant equitable relief." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (internal quotation marks omitted). As a result, when plaintiffs seek such remedies, courts "respect the plaintiff's choice" and may hear those claims as long as that relief is not "negligible in comparison" to potential monetary recovery, even if a plaintiff "file[s] the complaint with an eye to future monetary awards." *Kidwell*, 56 F.3d at 284. Thus, precluding jurisdiction here would leave HFA without any forum to challenge USDA's unlawful termination

of the statutorily mandated funding for the clearinghouse services and to secure the forward-looking relief it seeks. *See Climate United Fund*, 2025 WL 1131412, at *11 (asserting jurisdiction after recognizing that plaintiffs "challenge EPA's thinly veiled attempts to dismantle the entirety of a congressionally created program and seek other declaratory relief that … the Federal Court of Claims cannot grant").

**2.** The en banc D.C. Circuit's recent endorsement of Judge Pillard's panel dissent from an order granting a partial stay pending appeal of a preliminary injunction issued in *Widakuswara v. Lake*, No. 25-cv-1015 (D.D.C.), a case challenging the dismantling of the U.S. Agency for Global Media, is also instructive. There, the en banc court concluded that the government was unlikely to succeed in its argument that the Tucker Act precluded the district court's jurisdiction "substantially for the reasons explained by Judge Pillard" in her panel dissent. *See Widakuswara v. Lake*, 2025 WL 1521355, at *1 (May 28, 2025). That opinion noted that "the plaintiffs' asserted rights arise from federal statutes . . . and they exist independent of any contract with [the government.]" *Widakuswara v. Lake*, 2025 WL 1288817, at *11 (May 3, 2025). So too here. And as in that case, HFA brings "a classic APA challenge to the Agency's impoundment of funds—agency action that is both arbitrary and heedless of Congress's commands." *Id.* "What matters," as Judge Pillard explained, "is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Id.* at *12.

There, as here, the type of relief sought further confirmed that jurisdiction in the district court was proper. Plaintiffs in that case sought "injunctive and declaratory relief"; "no count sound[ed] in contract, and none s[ought] money damages for breach." *Id.* at *13. The claims in that case, like the claims here, thus "d[id] not belong in the Court of Claims." *Id.*

**3.** The Supreme Court's recent decisions on the emergency docket do not alter this analysis. In early March, the Supreme Court declined to stay a preliminary order requiring the government to disburse certain foreign assistance funds, even as the government argued that the plaintiffs had raised claims for monetary relief that belonged in the Court of Claims. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025). A month later, the Court granted a stay of a temporary restraining order that several states had secured in their challenge to the Department of Education's termination of funding for certain teacher-training programs. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). In the single paragraph discussing jurisdiction in *California*, the Court wrote that the agency was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). At the same time, the Court reiterated that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910).

Those contrasting decisions apply the pre-existing jurisdictional framework, which remains governed by *Bowen* and other binding precedents, rather than purporting to change that framework. *See id.* (quoting *Bowen*, 487 U.S. at 910); *see also Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 25-cv-02847-AMO, 2025 WL 1168898, at *3 (N.D. Cal. Apr. 21, 2025) (observing that the government "fail[ed] to identify anything different about the law following [*California*], much less a significant change sufficient to warrant dissolution of earlier-granted injunctive relief"); *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097-MSM, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) (concluding that *California* did not divest the court of

jurisdiction to hear claims related to the freezing of federal funds); *Maine v. USDA*, No. 1:25-cv-00131-JAW, 2025 WL 1088946, at *19 n. 8 (D. Me. Apr. 11, 2025) (same). In *California*, the plaintiff States only alleged, and the TRO was only based on, claims under the APA that related to the terms of the individual grant awards. *See California v. U.S. Dep't of Educ.*, 1:25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 1 (complaint); *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) (observing that "the terms and conditions of each individual grant award" were at issue). The claims in this case, in contrast, turn on the School Lunch Act, the Impoundment Control Act, and the APA, not on the terms of the clearinghouse contract.

### C.    Plaintiffs are likely to succeed on their APA claims.

The APA authorizes a reviewing court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). HFA is likely to succeed on its claims that USDA violated the School Lunch Act and the Impoundment Control Act and acted arbitrarily and capriciously by terminating funding for the clearinghouse services.

### 1.    USDA's termination of funding for the clearinghouse services constitutes final agency action.

The APA provides for judicial review of "final agency action," 5 U.S.C. § 704, and defines "agency action" broadly to mean "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13). This definition "is expansive … [and] is meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (internal quotation omitted). The APA further defines an "order" to be "the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Thus, "an

order is virtually any authoritative agency action other than a rule." *N.Y. Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021). "These categories," moreover, "are imprecise, and courts have made the threshold determination of reviewable agency action on a case-by-case basis." *Industrial Safety Equipment Ass'n , Inc. v. EPA*, 837 F.2d 1115, 1117 (D.C. Cir. 1988).

An agency action is "final" if it satisfies two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process," meaning that it "must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). "The mere possibility that an agency might reconsider," however, "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see Nat'l Envt'l Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1066 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.").

USDA's decision to terminate funding for the clearinghouse services constitutes reviewable final agency action. USDA indicated to HFA that it does not view itself as bound to comply with the School Lunch Act, and it allowed HFA's clearinghouse contract to lapse without having taken any steps to secure a replacement contract. Since then, USDA has taken no public action to enter a contract for the clearinghouse services with a nongovernmental organization, as required by statute. To the contrary, USDA took down the main webpage for the National Hunger Hotline and removed references to the hotline from other locations on its website. Berg Decl. ¶ 28. The record thus reflects that USDA has made a final decision to terminate funding for the clearinghouse services. As a result of that decision, HFA cannot exercise its statutory right to bid for the clearinghouse contract, and USDA has relieved itself of its statutory obligation to spend

the funds that Congress appropriated for the clearinghouse. USDA's decision to terminate funding for the clearinghouse services is thus reviewable under the APA.

### 2. USDA's termination of funding for the clearinghouse services is contrary to law.

#### a. USDA violated the School Lunch Act.

In the School Lunch Act, Congress provided that USDA "shall enter into a contract with a nongovernmental organization" to "establish and maintain a clearinghouse" of food assistance resources. 42 U.S.C. § 1769g(a). It further directed that USDA "shall accept the funds" appropriated for the clearinghouse, and appropriated $250,000 for fiscal year 2025. *Id.* § 1769g(d). Those provisions, using the word "shall," are commands to USDA, not suggestions. *See Me. Cmty. Health Options*, 590 U.S. at 310 ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"). Within the limits imposed by the statutory criteria for the contractor, *see* 42 U.S.C. § 1769g(b), USDA has discretion about where to award the contract. It has no discretion, however, to refuse to award the contract at all, or to terminate funding entirely for the clearinghouse services. But that is precisely what USDA did here.

Because "[a]dministrative agencies are creatures of statute," *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022), they are "not free simply to disregard statutory responsibilities," *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). An agency thus may not, for example, disregard a "legal obligation to continue [a] licensing process." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). So too with a legal obligation to enter into a contract.

Nor does the executive branch "have unilateral authority to refuse to spend" "the full amount appropriated by Congress for a particular project or program." *Id.*, 725 F.3d at 261 n.1; *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from

18

the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress.").

Even if USDA were to have had some basis for wishing to replace HFA as the contractor for the clearinghouse services—despite consistently rating HFA's performance as satisfactory in every respect—it could easily have sought a new contractor without any risk of disruption to the clearinghouse services. At any time during the one-year base period for the 2024 contract, USDA could have sought bids for a new contract starting May 21, 2025. If USDA for any reason had been unable to act in time to allow for a new contract before the expiration of the 2024 contract, it could have exercised its option to extend services under the 2024 contract for up to six months past May 20 without having to extend the contract by using an option year. And if both of those options failed, USDA could also have exercised its right to extend the contract for twelve months and sought bids for a new contract to start May 21, 2026. USDA's failure to take any of those options plainly bespeaks its view that, in the words of one contracting officer, "it is the Government who determines agency need to go along with" the School Lunch Act's mandate. Berg Decl. ¶ 24. But the unambiguous language of that Act makes the awarding of the clearinghouse contract mandatory for USDA. USDA's decision to terminate funding for the clearinghouse services is thus contrary to law.

### b. USDA has violated the Impoundment Control Act.

Because USDA has unlawfully refused to spend money duly appropriated by Congress, and signed into law by the President, it has also violated the Congressional Budget and Impoundment Control Act of 1974. Pub. L. No. 93-344, 88 Stat. 332 (July 12, 1974), and the Constitution's delegation of the power of the purse to Congress, which underlies that statute.

Congress enacted the Impoundment Control Act in response to President Nixon's repeated "withholding" of appropriated "funds from various programs he did not favor" "as a means of shaping domestic policy to his liking." *City of New Haven v. United States*, 634 F. Supp. 1449, 1454 (D.D.C. 1986). "[T]o restore responsibility for the spending policy of the United States to the legislative branch," Congress, through the Impoundment Control Act, created specific procedures for the executive branch to seek permission to avoid spending appropriated funds. *City & Cnty. of San Francisco*, 897 F.3d at 1234 n.3 (quoting H.R. Rep. No. 93-658, *as reprinted in* 1974 U.S.C.C.A.N. 3462, 3463). Under those procedures, if the President does not want to spend funds that Congress has appropriated for a program, he must transmit a special message to Congress detailing his request not to spend the money. 2 U.S.C. § 683(a). Even then, the President is allowed not to spend the funds available for obligation only if both houses of Congress pass a bill rescinding the funding within 45 days. *Id.* § 683(b). Absent compliance with the mechanism laid out in the ICA, congressionally appropriated funds "shall be made available for obligation." *Id*.

None of the Impoundment Control Act's preconditions has been satisfied here. President Trump has not sent a message to Congress asking for permission not to spend the money appropriated for the clearinghouse contract, and Congress has not passed a statute relieving the executive of its obligation to spend those funds. Accordingly, USDA lacks authority to allow the clearinghouse contract to lapse without replacement because that decision necessarily results in a failure to spend the funds Congress appropriated for that purpose in the School Lunch Act.

### 3.    USDA's termination of funding for the clearinghouse services is arbitrary and capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *DHS v. Regents of the Univ.*

*of Cal.*, 591 U.S. 1, 16 (2020) (internal citation omitted) (first quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015), then quoting 5 U.S.C. § 706(2)(A)). When reviewing an agency action under the arbitrary and capricious standard, "the court must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The decision to terminate funding for the clearinghouse services was arbitrary and capricious for several reasons.

USDA failed to provide any explanation at all for its decision to cease funding the clearinghouse services, let alone a reasoned one. USDA neither acknowledged that terminating funding for the clearinghouse services was a stark change in position, nor explained the reason for this about face.

An agency may not "depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Pacito v. Trump*, 2025 WL 893530, at *11 (W.D. Wash. Mar. 24, 2025) (concluding that, without any "factual findings or bases for" the State Department's decision to terminate funding for refugee assistance programs, the termination "constitutes" an arbitrary and capricious "shift in agency policy without any reasoned explanation"). USDA's unexplained action here thus fails the APA's "requirement that an agency provide reasoned explanation for its action." *Fox Television Stations, Inc.*, 556 U.S. at 515.

USDA also failed to consider the significant reliance interests at stake, much less "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. HFA relies on the clearinghouse contract to enable it to connect upwards of 20,000 callers per year with accessible food assistance resources, as part of its mission to end domestic hunger and ensure that all

21

Americans have sufficient access to nutrition. Berg Decl. ¶¶ 3, 14. Likewise, tens of thousands of Americans rely on the National Hunger Hotline, the texting service, and HFA's online food assistance database to provide food for their families—particularly in early to mid-summer, when school meal programs are generally closed and the need for assistance in locating alternative food resources is at its highest. *Id.* ¶ 37. USDA's failure to consider those reliance interests was arbitrary and capricious.

## II.    Plaintiff will suffer irreparable harm absent preliminary relief.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). The "concept of irreparable harm may be difficult to define" in a simple formula, *TD Intern., LLC v. Fleischmann*, 629 F. Supp. 2d 46, 47 (D.D.C. 2009), but courts have recognized several guideposts for the irreparable harm inquiry.

Agency action that "make[s] it more difficult for [an organization] to accomplish its primary mission" is a cognizable "injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Moreover, although "economic loss does not," as a general matter "in and of itself, constitute irreparable harm," because of "'[t]he possibility that adequate compensatory or other corrective relief will be available at a later date,'" *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)), monetary loss that "threatens the very existence of the movant's business" can be sufficient to support an injunction. *Id.* And when "the claimed economic loss is unrecoverable (e.g. because the defendant is entitled to sovereign immunity), this is 'one factor the court must consider in assessing the alleged irreparable harm.'" *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (quoting *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011)); *cf, e.g.*, *Air*

*Transport Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (requiring that "economic harm be significant, even where it is unrecoverable because a defendant has sovereign immunity.")

"Injury to reputation" can also "rise to the level necessary to support the issuance of an injunction." *Atlas Air Co. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017); *see, e.g.*, *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *19 n.19 (noting evidence showing "severe harm" to "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders."); Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 (3d ed.) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Courts have also found that agency actions that result in "[s]hutting down necessary systems, laying off personnel, and terminating contracts, even ones that might be able to eventually be reinstated" can cause sufficient irreparable harm to support an injunction. *Widakuswara v. Lake*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *16 (D.D.C. Apr. 22, 2025); *see, e.g.*, *Express One Int'l v. USPS*, 814 F. Supp. 87, 91 (D.D.C. 1992) (finding irreparable injury where the plaintiff faced "significant lay-off, capital, and facility costs inherent in closing down and restarting a major transportation network.")

Ultimately, the irreparable harm inquiry turns on whether any "backend remedy could ameliorate" the harms that a plaintiff will suffer absent an injunction. *Doctors for Am. v. OPM*, 766 F. Supp. 3d 39, 55 (D.D.C. 2025). Here, vindication at the end of this litigation cannot undo the damage that HFA will suffer, and is already suffering, in the absence of an injunction. USDA's

decision to terminate funding for the clearinghouse services makes it substantially more difficult for HFA to carry out its primary mission of fighting domestic hunger and ensuring that all Americans have access to nutritious food. Berg Decl. ¶ 3. HFA has already had to divert resources away from its data department, and from its research efforts that inform policymaking at all levels, to keep the clearinghouse services running temporarily. *Id*. ¶ 30. If USDA does not comply with its statutory obligation to award a contract for the clearinghouse services—whether to HFA or to another qualified contractor, if one can be found—HFA will also imminently have to decide whether to shut down the National Hunger Hotline and lay off its staff. *Id*. ¶ 32. Shutting down the hotline and the texting service, and ceasing to update the food resources database, would cause incalculable damage to HFA's hunger-fighting mission, and would also cause lasting harm to the clearinghouse services themselves, if they were ever to be restored. *Id*. ¶¶ 32, 36-37. The clearinghouse services rely on word of mouth from users, and on the reputation and relationships that HFA has built with social service providers over the course of more than a decade. *Id*. ¶ 37. If service were to abruptly end, the reputation  of the clearinghouse services as reliable resources would be permanently tarnished. *Id*.

HFA could alternatively attempt to keep the clearinghouse services running at the cost of irreparable harm to its other organizational priorities, including its Data Division and its work in pre-screening and assisting applicants for nutrition benefits. *Id*. ¶ 33. Even a lesser step like reassigning hotline staff to other HFA programs to avoid the permanent loss of human capital for the hotline would necessarily come at the cost of irreparable harm to other programs, whose funding would be sacrificed to keep hotline staff on payroll. *Id*. ¶ 32.

All of those harms are already occurring or imminently will occur, and none can be remedied if relief is delayed until the end of litigation. HFA has thus amply demonstrated irreparable injury sufficient to warrant a preliminary injunction.

## III.    The balance of equities and public interest favor Plaintiffs.

Finally, the balance of the equities and public interest support enjoining USDA's unlawful decision to terminate funding for the clearinghouse services. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). There is likewise "generally no public interest in the perpetuation of an unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks omitted). Thus, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that [injunctive relief] would serve the public interest." *Id.*

There is also an urgent public interest, independent of the statutory merits, in the maintenance of the clearinghouse services, which help thousands of the most vulnerable members of society locate accessible food assistance services every month. Berg Decl. ¶ 14. As a centralized resource that combines public and private sources of food assistance in easy to use phone, text, and online resources, the clearinghouse not only keeps food on the table for Americans in desperate need, but also eases the burden on state and federal taxpayers by directing users to private community- and faith-based resources as well as public nutrition assistance programs. Berg Decl. ¶ 11. The public interest strongly favors reversing USDA's unlawful and arbitrary decision to terminate funding for the clearinghouse services.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction requiring USDA to enter into a contract with a nongovernmental organization to establish and maintain an information clearinghouse services as required by the School Lunch Act.

Dated: June 20, 2025                               Respectfully submitted,

                                          /s/ Cormac A. Early
                                          Cormac A. Early (DC Bar No. 1033835)
                                          Allison M. Zieve (DC Bar No. 424786)
                                          Adina H. Rosenbaum (DC Bar No. 490928)
                                          Public Citizen Litigation Group
                                          1600 20th Street NW
                                          Washington, DC 20009
                                          (202) 588-1000

                                          *Counsel for Plaintiff*